# Jeff Potts Complaint



# TRACY WINKLER
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

ELECTRONICALLY FILED
August 29, 2012 02:22 PM
TRACY WINKLER
Clerk of Courts
Hamilton County, Ohio
CONFIRMATION 180493

**JEFF POTTS**                           A 1206877

vs.
**ABUBAKAR ATIQ DURRANI**

**FILING TYPE:  INITIAL FILING (IN COUNTY) WITH JURY
DEMAND**

**PAGES FILED: 12**

EFR200

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO
Case No.: _____

JEFF AND CHERYL POTTS

       Plaintiffs

v.

ABUBAKAR ATIQ DURRANI, M.D.
4555 Lake Forest Drive, Suite 150     :
Cincinnati, OH 45242     :
    (Serve via Certified Mail)

And

CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC. [CAST]
4555 Lake Forest Drive, Suite 150
Cincinnati, OH 45242

Serve: CT Corporation System
1300 East 9th St. Ste 1010
Cleveland, OH 44114
    (Serve via Certified Mail)

       Defendants.

Judge _____

COMPLAINT & JURY DEMAND

Come now the Plaintiffs, Jeff and Cheryl ("Cheri") Potts, by and through counsel, and for their Complaint, state as follows:

## PARTIES

1. Plaintiffs, Jeff Potts and Cheri Potts are married residents of Hamilton County, Ohio.

2. At all times relevant herein, Center for Advanced Spine Technologies, Inc. ("CAST") is and was a duly licensed corporation organized and existing under the laws of the State of Ohio and having its principal place of business located at 4555 Lake Forest Dr., Suite 150, Cincinnati, Ohio 45242. The statutory agent for Center For Advanced Spine Technologies, Inc. is CT Corporation System, whose mailing address is 1300 East Ninth Street, Suites 1010, Cleveland, Ohio 44114.

1

3. At all times relevant herein, Defendant Abubakar A. Durrani, M.D., who is also known as A. Atiq Duranni, M.D. ("Defendant Durrani"), was a duly licensed physician in the State of Ohio, and was a physician who provided surgical care and treatment to Jeff Potts on October 15, 2010. Defendant Dr. Duranni is a representative of Defendant CAST through which he provided medical services to Plaintiff Jeff Potts. Defendant Durrani can be served at his principal place of business located at 4555 Lake Forest Dr., Suite 150, Cincinnati, Ohio 45242.

4. At all times relevant herein, CAST, held itself out to the public, and specifically to Plaintiffs, as a company providing competent and qualified medical, nursing and surgical services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

5. At all times relevant herein, Defendant Durrani was an agent, ostensible agent, servant, and/or employee of CAST, and was acting within the course and scope of his agency and/or employment at the time of his care and treatment of Jeff Potts.

6. At all times relevant herein, Defendant Durrani owed a duty to Plaintiffs to exercise that degree of skill, care and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

7. At all times relevant herein, Defendant CAST owed a duty to Plaintiffs to exercise that degree of skill, care and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

8. At all times relevant herein, Defendant CAST owed a duty to Plaintiffs to provide competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

9. At all times relevant herein, Dr. Duranni was the supervising attending Physician when care and treatment was provided to Jeff Potts at the offices of Defendant Durrani and CAST and other hospital facilities.

10. Plaintiffs filed a Complaint against Defendants Durrani and CAST on April 25, 2011.

11. Said Complaint against Defendants was subsequently dismissed without prejudice on September 22, 2011.

2

12. An affidavit of merit is attached.

## FACTUAL ALLEGATIONS

13. Plaintiffs hereby incorporate by reference all of the allegations and averments set forth above as if fully rewritten herein.

14. On or about June 1, 2010, Plaintiff Jeff Potts sought treatment from CAST for management of back pain.

15. Dr. Tyab of CAST recommended that Plaintiff obtain an MRI, among other measures.

16. On the day the MRI was performed, Defendant Durrani's office contacted Plaintiff and advised that Plaintiff needed surgery.

17. On or about October 15, 2010, Jeff Potts submitted to the care, treatment and management of these Defendants for the performance of spinal surgery including direct lumbar interbody fusion of L3/L4, lumbar discectomy of L3/L4, posterior spinal instrumentation of L3/L4 using pedicle screws, posterior spinal fusion using autograft and allograft at L3/L4, exploration of L5/S1, and lumbar laminectomy of L5/S1 with bilateral foraminotomy. Surgery was performed in the lateral position with the right flank up by Defendant Durrani.

18. Upon information and belief, Defendant Durrani had had his privileges suspended revoked, or had been given the option to voluntarily resign his privileges in lieu of having his privileges suspended or revoked from one or more hospitals.

19. Preoperatively, these Defendants did not properly inform Jeff and Cheri Potts that Defendant Durrani had his privileges terminated from several hospital facilities.

20. Immediately postoperatively, and continuing thereafter, Jeff Potts had decreased leg pain, but increased severe back pain and abdominal pain.

21. Defendant Durrani discharged Jeff Potts from Good Samaritan Hospital on or about October 18, 2010.

22. On or about October 19, 2010, Jeff Potts returned to the emergency room at Good Samaritan Hospital for severe pain, at which time where he underwent exploratory surgery.

3

23. On or about October 19, 2010, Jeff Potts was found to have a perforated cecum described as a "through-and-through colostomy which created from the previous trocar site entry...through the right flank through-and-through the colon into the iliopsoas muscle."

24. The cecum is the beginning of the large intestine, and contains much bacteria.

25. Jeff Potts has required additional surgery to repair his colon and months of antibiotic therapy.

26. Defendants were negligent and deviated from the standard of care including, but not limited to, failure to appropriately perform surgery, failing to prevent and timely recognize, diagnose and treat intraoperative and post-operative injuries, including but not limited to bowel perforation and infection.

27. As a direct and proximate result of the negligence of these Defendants, Jeff Potts has endured physical pain and emotional suffering, additional and unnecessary medical expenses, lost wages and benefits, lost opportunities, scarring, permanent physical disfigurement, physical and psychological injuries, inconveniences, and other damages as outlined in this Complaint and will continue to do so in the future.

28. As a direct and proximate result of the negligence of these Defendants, Cheri Potts has endured the loss of love, affection, care, companionship, guidance, support and consortium of her husband Jeff Potts, and further has suffered lost wages and benefits, lost opportunities, unnecessary medical expenses, inconveniences, fear and apprehension.

## COUNT ONE
## MEDICAL NEGLIGENCE OF DEFENDANT DURRANI

29. Plaintiffs incorporate, adopt and reallege as if fully restated herein, those allegations contained in each preceding paragraph.

30. Defendant Durrani owed Plaintiffs the duty to exercise that degree of skill, care and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

31. Defendant Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, providing insufficient preoperative information concerning the need or lack of need for surgery, negligent performance of the surgery described herein, and medical mismanagement and

4

mistreatment of Plaintiff, including, but not limited to improper performance of the surgery, failure to recognize and correct his surgical mistake, failure to take appropriate measures to prevent infection, failure to recognize and appropriately address post-operative changes in condition and post-operative complications, failure to obtain proper informed consent, improper follow-up care, and lax documentation.

32. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by Defendant Durrani, Plaintiffs were caused to sustain severe and grievous injuries, severe and prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and has incurred, and will continue to incur substantial medical expenses and treatment.

## COUNT TWO
## MEDICAL NEGLIGENCE OF DEFENDANT CAST

33. Plaintiffs incorporate, adopt and re-allege as if fully restated herein each and every allegation contained within the above paragraphs and further state:

34. Defendant CAST owed its patient Jeff Potts the duty to exercise that degree of skill, care and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

35. Defendant CAST breached that duty by failing to exercise the requisite degree of skill, care and diligence an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, its negligent mismanagement, negligent diagnosis and negligent treatment of Plaintiffs.

36. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by Defendant CAST, Plaintiffs were caused to sustain severe and grievous injuries, severe and prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and has incurred, and will continue to incur substantial medical expenses and treatment.

## COUNT THREE
## VICARIOUS LIABILITY OF DEFENDANT CAST

5

37. Plaintiffs incorporate, adopt and reallege as if fully restated herein each and every allegation contained within the above paragraphs and further state:

38. At all times relevant, Defendant Durrani was a shareholder, director, officer, agent and/or employee of CAST.

39. Defendant Durrani was performing within the scope of his employment when rendering medical services or treatment to Plaintiff.

40. Defendant CAST is responsible for harm caused by the actions of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

41. Defendant CAST is vicariously liable for the negligent actions of Defendant Durrani as alleged in this Complaint.

42. As a direct and proximate result of Defendant CAST's acts and omissions as set forth in this Complaint, Plaintiffs sustained permanent injuries and monetary damages as set forth in this Complaint.

## COUNT FOUR
## NEGLIGENT HIRING/RETETION BY CAST

43. Plaintiffs incorporate, adopt and re-allege as if fully restated herein each and every allegation contained within the above paragraphs and further state:

44. Upon information and belief, Defendant Durrani had privileges terminated, revoked or otherwise suspended or acted upon negatively at his places of previous employment as a result of misconduct, substandard care, medical negligence and/or negative outcomes.

45. Defendant CAST owed a duty to its patients, including Plaintiffs, to exercise reasonable care in the selection, retention and supervision of its employees, including Defendant Durrani.

46. Defendant CAST breached its duty to exercise reasonable care in the selection, employment and/or retention of employees when it employed and allowed Defendmat Durrani to treat patients in spite of the knowledge that Defendant Durrani's privileges had been terminated, revoked or otherwise suspended or acted upon negatively at one or more of his previous places of employment or places at which he held privileges.

6

47. As a direct and proximate result of Defendant CAST's breach of its duties, Plaintiffs sustained permanent injuries and monetary damages as set forth in this Complaint.

## COUNT FIVE
## NEGLIGENT SUPERVISION AND TRAINING BY CAST

48. Plaintiffs incorporate, adopt and re-allege as if fully restated herein each and every allegation contained within the above paragraphs and further state:

49. Defendant CAST owed a duty to its patients and families, including Plaintiffs, to exercise reasonable care in the supervision and training of its agents, employees and servants, including Defendant Durrani.

50. Defendant CAST breached its duties to exercise reasonable care in the supervision and training of its agents, servants and employees, including the failure to create and implement policies and procedures, improperly granting privileges to Defendant Durrani, negligently allowing Defendant Durrani to render medical services, including surgery, on patients including Plaintiff Jeff Potts, failure to properly supervise its physicians including Defendant Durrani, and in permitting or failing to prevent the negligent and otherwise tortious conduct of Defendant Durrani, as outlined in this Complaint, upon their premises, under their corporate name and contracts, and/or with instrumentalities under their control.

51. Defendant CAST knew or had reason to know that such failures created a risk of harm to Plaintiffs.

52. As a direct and proximate result of Defendant CAST's breach of its duties, Plaintiffs sustained permanent injuries and monetary damages as set forth in this Complaint.

## COUNT SIX
## BATTERY BY DEFENDANT DURRANI

53. Plaintiffs incorporate, adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

54. Defendant Durrani committed battery against Jeff Potts by performing medical procedures on Jeff Potts for which he did not properly obtain informed consent, including a failure to appropriately advise Plaintiff of the particular procedures and surgeries that were being performed, failure to provide appropriate information regarding the necessity of the procedures that were to be performed, failure to obtain consent for those

7

procedures, and by physically striking and causing harm to the bowel of Jeff Potts without the consent of Jeff Potts.

55. As a direct and proximate result of the aforementioned battery by Defendant, Plaintiff was caused to sustain severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and has incurred and will continue to incur substantial medical expenses and treatment.

## COUNT SEVEN - LACK OF INFORMED CONSENT (DURRANI)

56. Plaintiffs incorporate, adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

57. Defendant Durrani had a duty to inform Plaintiff, Jeff Potts of material risks and dangers inherent or potentially involved in the surgery of October 15, 2010, including but not limited to bowel perforation, infection, the need for additional surgeries, and sepsis.

58. Defendant Durrani failed to inform Plaintiffs of the material risks and dangers inherent or potentially involved in the procedures performed on October 15, 2010.

59. Plaintiff Jeff Potts subsequently developed severe and grievous injuries as a direct and proximate result of lack of informed consent, and other acts and omissions as outlined in this Complaint.

60. Had Plaintiff, Jeff Potts been appropriately informed of the need or lack of need for surgery and the risks of such procedures, he would not have undergone surgery by Defendant Durrani.

## COUNT EIGHT – FRAUD
## DURRANI

61. Plaintiffs incorporate, adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

62. Defendant Durrani made material, false representations to Plaintiff, Jeff Potts in the course of his care and treatment. Such false representations include, but are not limited to improper information regarding the particular procedures that were to be performed on Jeff Potts; improper information regarding the necessity of the surgical procedures to be performed, that no complications had arisen during the surgery; that the bowel

8

perforation which was ultimately discovered was not caused by Defendant Durrani, and that Defendant Durrani was a competent physician.

63. Moreover, Defendant Durrani's failure to disclose significant information about Plaintiff's condition and the medical procedures that were planned, attempted and/or performed on Plaintiff also amounted to material false misrepresentations. Such misrepresentations included, but are not limited to the failure to accurately inform Plaintiff of his medical condition including but not limited to the particular conditions that required surgery, existence of tear in the cecum, and/or discovery of the tear, the unperformed, incomplete and/or improper repair of the tear of the cecum during the October 15, 2010 surgery, the material and significant risks inherent or potentially involved with the surgical procedures performed by Defendant Durrani as outlined in the preceding paragraphs, the existence of infection in the surgical site and perforation site, and the suspicion of a tear of the cecum during and immediately after the October 15, 2010 surgery.

64. Defendant Durrani further made material misrepresentation to Plaintiffs by failing to disclose significant information regarding Defendant Durrani's competency to practice medicine, history of negative medical outcomes, prior medical negligence, and professional history involving the revocation, termination, suspension or other negative actions involving Defendant Durrani's employment and privileges and previous health care facilities and on previous patients.

65. Defendant Durrani knew that such representations were false, and/or Defendant Durrani made the misrepresentations with such utter disregard and recklessness as to whether they were true or false that knowledge of their falsity may be inferred;

66. Defendant Durrani made the misrepresentations with the intent of misleading Plaintiffs into relying upon them;

67. Plaintiff Jeff Potts and his family justifiably relied upon the material misrepresentations of Defendant Durrani when making the decision to undergo the preoperative care and subsequent surgery on October 15, 2010, as well as in their decision to continue treatment with Defendants following the October 15, 2010 surgery.

68. As a direct and proximate result of the aforementioned, Plaintiff did undergo the October 15, 2010 surgery and Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of earnings and loss of ability to perform usual and customary activities and has incurred and will continue to incur substantial medical expenses and treatment.

9

## COUNT NINE – FRAUD
### CAST

69. Plaintiffs incorporate, adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

70. Defendant CAST made material, false representations to Plaintiff, Jeff Potts in the course of his care and treatment. Such false representations include, but are not limited to omitting significant information regarding Defendant Durrani's competency or lack thereof as a medical provider, omitting significant information regarding Defendant Durrani's history of negative medical outcomes, and professional history involving the revocation, termination, suspension or other negative actions involving Defendant Durrani's employment and privileges and previous health care facilities. The failure to disclose this information, coupled with allowing Defendant Durrani to maintain privileges and holding Defendant Durrani out as a competent physician amounted to a material misrepresentation of fact to Defendants' patients, including Plaintiffs herein.

71. Defendants knew that such misrepresentations were false, and/or Defendants made the misrepresentations with such utter disregard and recklessness as to whether they were true or false that knowledge of their falsity may be inferred;

72. Defendants made the misrepresentations with the intent of misleading Plaintiffs into relying upon them;

73. Plaintiff Jeff Potts and his family justifiably relied upon the material misrepresentations of Defendants when making the decision to undergo preoperative care, surgery on October 15, 2010, and post-operative care.

74. As a direct and proximate result of the aforementioned, Plaintiff did undergo the October 15, 2010 surgery and related care, and sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of earnings and loss of ability to perform usual and customary activities and has incurred and will continue to incur substantial medical expenses and treatment.

## COUNT TEN
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

75. Plaintiffs incorporate adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

10

76. Defendant Durrani intended to, and in fact, caused emotional distress to the Plaintiffs.

77. Defendant Durrani's conduct was so extreme and outrageous as to go beyond the bounds of decency and was such that the conduct can be considered utterly intolerable in a civilized society.

78. Defendant Durrani was the proximate and actual cause of the Plaintiffs' psychiatric and emotional injuries, mental anguish, suffering, and distress.

79. The distress and anguish suffered by the Plaintiffs is so serious and of a nature no reasonable man or woman could be expected to endure.

## COUNT ELEVEN – LOSS OF CONSORTIUM

80. Plaintiffs incorporate adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

81. Plaintiff Jeff Potts is married to Plaintiff Cheri Potts, and Cheri Potts brings this separate cause of action for the loss of consortium, companionship, love, and affection of her husband, Jeff Potts, which loss was directly and proximately caused by the negligent acts, omissions, recklessness, and intentional conduct of the Defendants as outlined in this Complaint.

82. As a direct and proximate result of the conduct of the Defendants as outlined in this Complaint, Plaintiff Cheri Potts has incurred, and will continue to incur the loss of enjoyment of her husband, loss of love, significant medical expenses and miscellaneous expenses, costs, charges, lost work time, inconveniences, lost benefits, and lost work opportunities.

## COUNT TWELVE – PUNITIVE DAMAGES

83. Plaintiffs incorporate adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

11

84. Defendants' actions were outrageous, wanton, reckless, reprehensible, egregious, malicious and constituted aggravated and/or egregious fraud, and said actions caused Plaintiffs permanent injuries and monetary damages as set forth in this Complaint.

## PRAYER FOR RELIEF

*WHEREFORE*, Plaintiffs demand judgment against Defendant on all claims. Plaintiffs further request:

1. Costs associated with this action;

2. Interest;

3. Punitive damages;

4. Reasonable attorneys' fees;

5. All compensatory damages;

6. Trial by jury; and

7. All other relief this court deems fitting and proper.

Respectfully submitted:

\s\Eric C. Deters
Eric C. Deters, Esq.
Eric C. Deters & Partners, P.S.C.
5247 Madison Ave.
Independence, KY 41051
Phone: 859-363-1900
Fax: 859-363-1444
Attorney for Plaintiff

## JURY DEMAND

Plaintiffs respectfully request a trial by jury.

\s\Eric C. Deters
Eric Deters, Esq.

12

Aug. 21. 2012 2:10PM M A                                      No. 2983 P. 1

## Affidavit of Merit

I, Keith Wilkey, M.D., after being duly sworn and cautioned state as follows:

1. I have reviewed all relevant medical records reasonably available about Jeff Potts concerning the allegations of medical negligence.

2. I am familiar with the applicable standard of care.

3. Based upon my review of this record, my education, my training and experience, it is my belief, to a reasonable degree of medical probability that the care provided by the Defendant, Abubakar Durrani, M.D. was negligent and this negligence caused injury to Jeff Potts.

4. I devote at least on-half my professional time to the active clinical practice in my field of licensure, or to its instruction in an accredited school.

5. My curriculum vitae is attached.

**Further affiant sayeth naught.**

Keith Wilkey, M.D.

State of Missouri

County of St. Charles

The foregoing affidavit of merit was subscribed, sworn to and acknowledged, this 21 day of August, 2012 before me, a Notary Public by Keith Wilkey, M.D.

/S/ Seal

Angela Kay Poinsett

Notary

My commission expires: 07 18 2015

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11139515

ELECTRONICALLY FILED 08/29/2012 14:22 / IFIJ / A 1206877 / CONFIRMATION NUMBER 180493

Jason Romer, and his wife Jessica Romer Complaint

**FILED**

2013 FEB 19 PM 4:45

MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS

Eric C. Deters (0038050)

2013 22 0521

CLERK OF COURTS

**IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO
CIVIL DIVISION**

JASON ROMER, AND HIS WIFE,       :
JESSICA ROMER                    :
3438 Maple Tree Lane             :
Erlanger, KY 41018               :
                                 :
                                 :
                                 :
              Plaintiffs,        :
                                 :
                                 :
                                 :
v.                               :
                                 :
                                 :
ABUBAKAR ATIQ DURRANI, M.D.,     :
4555 LAKE FOREST DR., Suite 150  :
CINCINNATI, OH 45242             :
(Serve via Certified Mail)       :
                                 :
And                              :
                                 :
                                 :
CENTER FOR ADVANCED SPINE        :
TECHNOLOGIES, INC.               :
652 RODEO DRIVE                  :
ERLANGER, KY 41018-1279          :
                                 :
SERVE: JULIE HARTMANN            :
650 RODEO DRIVE                  :
ERLANGER, KY 41018-1279          :
(Serve via Certified Mail)       :
                                 :
And                              :
                                 :
WEST CHESTER HOSPITAL, LLC       :
7700 UNIVERSITY DRIVE            :
WEST CHESTER, OH 45069           :
                                 :
SERVE: GH&R BUSINESS SVCS., INC. :
511 WALNUT STREET                :
1900 FIFTH THIRD CENTER          :
CINCINNATI,OH 45202              :
                                 :
And                              :

Case No.

Judge

**COMPLAINT & JURY DEMAND**

FILED BUTLER CO.
COURT OF COMMON PLEAS

FEB 19 2013

MARY L. SWAIN
CLERK OF COURTS

1

UC HEALTH :
Serve: CT Corporation System :
1300 East 9th St. Ste 1010 :
Cleveland, OH 44114 :
(Serve via Certified mail)

Defendants. :
:

Now comes Plaintiffs, Jason Romer and Jessica Romer, and for their Complaint

with Jury Demand, state as follows:

## PARTIES, JURISDICTION AND VENUE

1. The incidents giving rise to this action occurred in Butler County, Ohio and

   Kenton County, Kentucky.

2. At all times relevant, Plaintiff Jason Romer ("Plaintiff") was an individual

   resident and citizen of Boone County, Kentucky.

3. At all times relevant, Plaintiff Jessica Romer ("Plaintiff") was an individual

   resident and citizen of Boone County, Kentucky.

4. Jason Romer is married to Jessica Romer.

5. At all times relevant, Defendant Dr. Abubakar Atiq Durrani ("Durrani") was

   licensed to and did in fact practice medicine in the State of Ohio and Kentucky.

6. At all times relevant, Center for Advanced Spine Technologies, Inc. ("CAST"),

   was licensed to and did in fact perform medical services in the State of Kentucky,

   and was and is a corporation authorized to transact business in the State of

   Kentucky.

2

7. At all time relevant, West Chester Hospital ("West Chester"), registered at the time of the incident as West Chester Medical Center, was a corporation authorized to transact business and perform medical services in the State of Ohio.

8. At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which included, owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

9. At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

10. The amount in controversy exceeds the jurisdictional threshold of this Court.

11. The subject matter of the Complaint arises out of medical treatment by the Defendants in Butler County, Ohio and Kenton County, Kentucky.

## BACKGROUND

12. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

13. When he was 18 years old, Jason Romer was diagnosed with degenerative disc disease.

14. In 2010, Jason Romer began having increased pain in his lower back and right leg, and had one epidural steroid injection at the Cleveland Clinic while working

3

in the area. Jason returned to Northern Kentucky shortly thereafter and did not

continue treatment at the Cleveland Clinic.

15. Jason Romer had increasing pain over the summer of 2011 and visited St. Elizabeth Edgewood Emergency Room on 09/07/2011.

16. Jason Romer went back to the St. Elizabeth ER on 10/05/2011 at which time he requested a surgical consult so that he could be seen by a specialist.

17. Dr Skidmore consulted and recommended physical therapy and pain management.

18. Dr. Skidmore did not recommend surgery.

19. Jason Romer began physical therapy and pain management per Dr. Skidmore's orders.

20. Jason Romer brought his x-ray and MRI films from St Elizabeth to the first appointment with Dr. Durrani at CAST on 12/06/2011. Dr. Durrani looked at the films and stated that PT would never help his problem, that Jason had severe spinal stenosis and that he needed immediate surgery.

21. Jason and Jessica explained to Dr. Durrani that Dr Skidmore advised against the surgery due to Jason's young age.

22. Dr. Durrani said that there was no reason for Jason to have a lifetime of pain, that he was newly married and he should be enjoying my life and he could fix it.

23. Dr. Durrani said he could go in and clean up the area, free up the nerve, it was a simple procedure and Jason would be up and walking the next day.

24. Dr. Durrani said Jason needed to have an epidural steroid injection first so his insurance would pay for the surgery.

25. Jason Romer had an injection at CAST on 12/08/2011.

4

26. Jason Romer had his follow up appointment with Dr. Duranni on 12/13/2011 at which time Dr. Durrani stated it was time to schedule the surgery.

27. Dr. Durrani performed surgery for a laminectomy and foraminotomy on 12/23/2011 at WestChester Hospital and Jason Romer was discharged on 12/24/2011.

28. Jason Romer could barely walk or function when he was discharged from West Chester Hospital

29. Following the surgery, Jason did not improve; Jason's pain was now more extreme, and he gained no relief from the surgery.

30. Jason therefore sought post operative answers and sought treatment at CAST with Dr. Durrani on three (3) occasions.

31. It does not appear from insurance claim history that Dr Duranni submitted all of Jason Romer's post-operative office visits during January and February 2012.

32. Jason Romer insisted to Dr. Durrani that something didn't feel right and the pain was different, new, and felt worse, and also that Jason was now having radiating pain and numbness, and partial paralysis symptoms in his left leg which had never happened before.

33. Dr. Durrani continually put Jason off, did not order any x-rays or scans, and said Jason just needed time to heal.

34. This didn't make sense to Jessica and Jason Romer, especially since Dr, Durrani had insisted this was an easy simple procedure and Jason would be up walking without the aforementioned symptoms, immediately after the surgery.

35. On 02/23/2012, Jason was unable to walk at all, and the pain was not bearable. Jason was taken to the St. Elizabeth Emergency Room and following X-rays and MRI, Jason was admitted as an inpatient.

36. Dr. Kakarlapudi consulted and informed Jason Ronmer that as a result of the surgery by Dr. Durrani, Jason's vertebrate had been weakened and a slippage of the spine had now occurred. Both the left and right L5 nerves were being compressed. Jason now needed a spinal fusion.

37. Dr. Kakarlapudi scheduled the corrective surgery for 03/12/2012.

38. Upon being discharged from St. Elizabeth on 02/28/2012, Jason called Dr Duranni and made an appointment. Jason and Jessica Romer had numerous questions for Dr. Durrani and wanted to see what Dr. Durrani had to say, since they held him responsible for the failed surgery, and Dr. Durrani had repeatedly refused to listen to them when they told him something was wrong.

39. Dr. Durrani had no rational explanation for the failed surgery. Dr. Durrani looked at the scan and Jason had to point out to him where the slippage was.

40. Dr. Durrani said "yes, you need a fusion; we'll put you in the schedule for April". Jason and Jessica left and never went back.

41. The next week, his office called and tried to confirm a surgery date for the fusion.

42. Jason Romer politely but firmly informed them I was under the care of another physician and ask that CAST and Dr. Durrani no longer contact him.

43. Dr. Kakarlapudi performed the corrective, revision surgery on 03/12/12.

44. Jason Romer can occasionally now walk, with the assistance of a cane.

6

45. Jason continues to have numbness and loss of control of his right leg and is in constant pain. Jason can no longer work.

46. Dr. Bailey at Mayfield Clinic performed an EMG which indicated permanent damage to Jason Rome right L5 nerve.

47. On 12/06/2012, Jason had a spinal cord stimulator implanted, and remains on pain medication.

48. On February 15, 2013, Jason Romer was admitted as an inpatient to St. Elizabeth Hospital, Florence with increased pain and right leg paralysis.

## COUNT I: NEGLIGENCE – DOCTOR DURRANI

49. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

50. Defendant Durrani owed his patient, Jason Romer, the duty to exercise the degree of skill, care, and diligence of an ordinary prudent health care provider would have exercised under like or similar circumstances.

51. Defendant Durrani breached his duty causing damages by failing to exercise the requisite degree of skill, care and diligence that an ordinary prudent health care provider would have exercised under same or similar circumstances through, among other things, the negligent diagnosis, medical mismanagement and mistreatment of Jason Romer, including but not limited to unnecessary surgery, failed surgery, improper performance of surgery, and improper follow up care addressing the patient's concerns.

52. As a direct and proximate result of the aforementioned acts and omissions by the Defendant, Plaintiffs sustained severe and grievous injuries, prolonged pain and

7

suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of the ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT II: NEGLIGENCE - CAST

53. Plaintiffs incorporate by reference each and every allegation in the paragraphs above.

54. Defendant CAST owed its patient, Jason Romer, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

55. Defendant CAST breached that duty by failing to exercise the requisite degree of skill, care, and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, its negligent medical mismanagement, negligent diagnosis and mistreatment of Plaintiff.

56. As a direct and proximate result of the aforementioned acts and omissions by the Defendant, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of the ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT III: VICARIOUS LIABLITY - CAST

57. Plaintiffs incorporates by reference each and every allegation in the paragraphs above.

8

58. At all times relevant, Defendant Dr. Durrani was a shareholder, director, officer, agent, and/or employee of CAST.

59. Defendant Durrani was performing within the scope of his employment when dealing with the Plaintiffs.

60. Defendant CAST is responsible for harm caused by acts of employees for conduct that was within the scope of employment under the theory of respondeat superior.

61. Defendant CAST is vicariously liable for the negligent acts of Defendant Durrani alleged in this Complaint.

62. As a direct and proximate result of Defendant CAST's acts and omissions by and through its agents and/or employees, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of the ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

**COUNT IV: NEGLIGENT HIRING, RETENTION, CREDENTIALING &
SUPERVISION – CAST, WEST CHESTER HOSPITAL & UC HEALTH**

63. Plaintiffs incorporate by reference each and every allegation contained within the above paragraphs and further state:

64. Defendants were responsible for the hiring, credentialing, screening, oversight, and conduct of its residents, doctors, nurses and those doctors with privileges at the Hospital.

65. Defendants were in a unique position to control, monitor, and oversee the conduct and consequences of the residents, doctors, nurses and those with privileges, and owed a duty to Plaintiff to exercise said control.

9

66. Upon information and belief, Defendant Durrani had medical privileges terminated, revoked, suspended or acted upon negatively at his places of previous employment or places at which he held privileges, as a result of misconduct, substandard care, medical negligence and/or negative outcomes, including Children's Hospital and Christ Hospital.

67. Defendants owed a duty to its patients o exercise reasonable care in the hiring, selection, retention, supervision, monitoring, oversight and granting of privileges to physicians.

68. Defendants breached their duties by hiring and/or granting privileges to Defendant Durrani and allowing Defendant Durrani to maintain privileges, when they knew or should have known that Defendant Durrani was incompetent and/or that his privileges had been terminated, revoked, suspended or acted upon negatively at one or more of his previous places of employment or places at which he held privileges.

69. Defendants also breached this duty to Plaintiffs by not controlling the actions of the residents, doctors, nurses, and those with privileges, during the medical treatment of Jason Romer.

70. As a direct and proximate result of the acts and omissions described herein, including but not limited to failure to properly supervise medical treatment by the residents, doctors, nurses, and those with privileges at CAST and West Chester Hospital, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life,

10

and loss of the ability to perform usual and customary activities and incurred

substantial medical expenses and treatment.

## COUNT V: BATTERY - DEFENDANT DURRANI

71. Plaintiffs incorporate, adopt and allege as if fully restated herein, those allegations

contained in the above paragraphs.

72. Defendant Durrani committed battery against the Plaintiff Jason Romer by

performing a surgery that was unnecessary, contraindicated for Plaintiff's medical

condition, and for which he did not properly obtain informed consent for Jason

Romer, and by the failure to provide this information to Plaintiffs.

73. Plaintiffs would not have agreed to the surgery if they knew that the surgery was

unnecessary and not indicated.

74. As a direct and proximate result of the aforementioned battery by Defendant,

Plaintiffs were caused to sustain severe and grievous injuries, prolonged pain and

suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life,

the loss of ability to perform usual and customary activities and Plaintiffs have

incurred and will continue to incur substantial medical expenses and treatment.

## COUNT VI: FRAUD - DURRANI, WEST CHESTER HOSPITAL & UC HEALTH

75. Plaintiffs incorporate, adopt and allege those allegations contained in the above

paragraphs.

76. Defendants made material, false representations to Plaintiffs and their insurance

company related to Jason Romer's care and treatment, as outlined in this

Complaint.

11

77. Such false representations include, inter alia, stating that the surgery was imminently necessary; that further conservative treatment was unnecessary and futile; that the surgery would be simple; that Jason Romer would be walking immediately after the surgery; that the procedures and surgery billing to the insurance company was accurate and medically indicated; that the surgery was successful; that Jason Romer was medically stable and ready to be discharged.

78. Defendants knew or should have known such representations were false, and/or made the misrepresentations with such utter disregard and recklessness as to whether they were true or false that knowledge of their falsity may be inferred.

79. Defendants made the misrepresentations both before and after 12/23/11 with the intent of misleading Plaintiffs and their insurance company into relying upon them.

80. Plaintiffs and their insurance company justifiably relied upon the material misrepresentations of Defendants when making the decision to undergo and pay for the surgery performed on 12/23/11.

81. As a direct and proximate result of the aforementioned, Plaintiff Jason Romer did undergo surgery on 12/23/11, which was paid for in whole or in part by the Romer's insurance company, and sustained grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and Plaintiffs have incurred and will continue to incur substantial medical expenses and treatment.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

82. Plaintiffs incorporate adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

83. Defendants intended to, and in fact, caused emotional distress to the Plaintiffs.

84. Defendants' conduct was so extreme and outrageous as to go beyond the bounds of decency and was such that the conduct can be considered utterly intolerable in a civilized society.

85. Defendants' conduct was the proximate and actual cause of the Plaintiffs' psychiatric and emotional injuries, mental anguish, suffering, and distress.

86. The distress and anguish suffered by the Plaintiffs is so serious and of a nature no reasonable man or woman could be expected to endure.

## COUNT VIII - VICARIOUS LIABILITY OF WEST CHESTER HOSPITAL & UC HEALTH

87. Plaintiffs incorporate by reference each and every allegation contained within the above paragraphs and further state:

88. At all times relevant, Dr. Durrani was an agent, employee, and/or performed services at the direction of, and/or for the benefit of West Chester Hospital and UC Health.

89. Dr. Durrani was performing within the scope of his employment when dealing with the Plaintiffs and their insurance company regarding the care of Jason Romer.

90. Defendants are responsible for harm caused by acts of its agents and employees for conduct that were within the scope of employment under the theory of respondeat superior.

13

91. Defendants are vicariously liable for the acts and omissions of Defendant Dr. Durrani as alleged in this Complaint.

92. As a direct and proximate result of the acts and omissions of CAST, West Chester Hospital and/or UC Health, Plaintiffs sustained grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and Plaintiffs have incurred and will continue to incur substantial medical expenses and treatment.

## COUNT IX: LOSS OF CONSORTIUM & MEDICAL EXPENSES

93. Plaintiffs incorporate, adopt and re-allege as if fully restated herein, those allegations contained in the above paragraphs.

94. At all times relevant, Plaintiffs Jason Romer and Jessica Romer were married.

95. That as a result of the wrongful acts and omissions of the Defendants, Plaintiffs Jason Romer and Jessica Romer were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

96. That all the aforesaid injuries and damages were proximately caused by the acts and omissions of the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants on all claims. Plaintiffs further request:

1. Costs associated with the disbursement of this action;

2. Interests;

14

3. Punitive damages, not to exceed $50,000,000.00 (fifty million dollars);

4. Reasonable attorney's fees;

5. All compensatory damages, not to exceed $5,000,000.00 (five million dollars);

6. Trial by jury; and

7. All other relief this court deems fitting and proper.

Respectfully submitted,

\s\ _[signature]_

Eric C. Deters (38050)
ERIC. C. DETERS &
PARTNERS, PSC
5247 Madison Pike
Independence, KY 41051
Phone: (859) 363-1900
Fax: (859) 363-1444
eric@ericdeters.com

## JURY DEMAND

Plaintiffs hereby respectfully request trial by jury on all issues.

Respectfully submitted,

_[signature]_

Eric C. Deters (0038050)
Attorney for Plaintiffs
ERIC C. DETERS & PARTNERS, P.S.C.
5247 Madison Pike
Independence, KY 41051-7941
Phone: 859-363-1900 Fax: 859-363-1444
Email: eric@ericdeters.com

15



# TRACY WINKLER
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

ELECTRONICALLY FILED
February 19, 2013 01:51 PM
TRACY WINKLER
Clerk of Courts
Hamilton County, Ohio
CONFIRMATION 226130

**STEPHANIE THREM**

**A 1301233**

vs.
**ABUBAKAR ATIQ DURRANI**

## FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND

## PAGES FILED: 36

EFR200

Jeff Roy Complaint

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

JEFF, DEBBIE and JOSHUA ROY
N280 Eastowne Lane
Appleton, WI 54915

A 1108652

        Plaintiff

Judge:   ROBERT P RUEHLMAN

v.

ABUBAKAR ATIQ DURRANI, M.D.
4555 Lake Forest Drive
Suite 150
Cincinnati, Ohio 45242

COMPLAINT AND
JURY DEMAND

      (Serve Certified Mail)

and

CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC.
4555 Lake Forest Drive
Suite 150
Cincinnati, Ohio 45242

      Serve: CT Corporation System
           1300 East 9th Street, STE 1900
           Cleveland, OH 44114

      (Serve Certified Mail)

and

CINCINNATI CHILDREN'S HOSPITAL
MEDICAL CENTER
333 Burnett Avenue
Cincinnati, Ohio 45229

      Serve: Frank C. Woodside, III
           1900 Chemed Center
           255 E. Fifth Street
           Cincinnati, Ohio 45202

      (Serve Certified Mail)

Comes now Plaintiffs, Jeff Roy, Debbie Roy and Joshua Roy, and for their Complaint and jury demand states as follows:

## JURISDICTION

1.      At all times relevant, Plaintiffs, Jeff, Debbie and Joshua Roy, were residents of and domiciled in the State of Ohio.

2.      At all times relevant, Defendant Dr. Abubakar Atiq Durrani was licensed to and did in fact practice medicine in the State of Ohio.

3.      At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio.

4.      At all times relevant, Cincinnati Children's Hospital Medical Center (hereinafter "Children's Hospital"), was a registered trade name for Children's Hospital Medical Center, a corporation authorized to transact business and perform medical services in the State of Ohio.

5.      Plaintiff attaches an Affidavit of Merit to this Complaint.

6.      The amount in controversy exceeds the jurisdictional threshold of this Court.

7.      The subject matter of the Complaint arises out of medical treatment by the Defendants in Hamilton County, Ohio. This Court is thus the proper venue to grant the Plaintiffs the relief they seek.

## BACKGROUND

8.      Plaintiffs incorporate by reference each and every allegation contained within the

above paragraphs.

9.       Plaintiffs Jeff and Debbie Roy are the parents of Joshua Roy.

10.     Joshua Roy is a 10-year-old boy who was born with a rare brain disorder.

11.     Joshua's brain disorder was diagnosed when he was 3 months old via an

ultrasound and MRI at Children's Hospital of Cincinnati.

12.     The disorder is called Agenesis of the Corpus Collosum.

13.     Joshua is considered globally delayed both mentally and physically.

14.     In February 2007 Joshua (then 7 years old) saw his pediatric developmental

specialist Dr. Michelle Zimmer at Children's Hospital of Cincinnati for a routine

check of his physical and mental abilities.

15.     At that time Dr. Zimmer noticed that Joshua's spine looked like it was starting to

curve.

16.     Prior to this visit Joshua had started taking growth hormone injections to help

stimulate his growth.

17.     At that time, Dr. Zimmer feared that scoliosis would develop as a result of the fast

growth of Joshua's spine induced by the growth hormone.

18.     Dr. Zimmer referred Plaintiffs to Orthopedics at Children's Hospital of Cincinnati

to have Joshua's spine x-rayed and reviewed.

19.     In April 2007 Plaintiffs met with Dr. Durrani for the first time.

20.     At this time Plaintiffs also discontinued giving Joshua growth hormones, due to

insurance issues.

21.     During that visit, Dr. Durrani ordered Joshua's back x-rayed.

22.     Also during that visit, Dr. Durrani discussed the results of Joshua's x-rays with

Plaintiffs.

23.     Dr. Durrani told Plaintiffs that Joshua had a 75%-85% curve to his upper spine.

24.     Dr. Durrani told Plaintiffs that something had to be done to help straighten
        Joshua's back.

25.     At this time Dr. Durrani explained to Plaintiffs that bracing or surgery were two
        available options to fix Joshua's back.

26.     Dr. Durrani decided to brace Joshua's back and for Plaintiffs to come back in 6
        months to see if the bracing had improved Joshua's back.

27.     Joshua wore his back brace for approximately 20-23 hours a day every day for
        one summer.

28.     Joshua's back brace severely limited his ability to move and function as he
        normally did.

29.     Because of the restrictions of the brace, Joshua spent most of his day lying down,
        unable to do anything productive in order to help him grow and become
        independent.

30.     In fall of 2007 Plaintiffs saw Dr. Durrani for a follow up examination.

31.     During this visit, Plaintiffs explained to Dr. Durrani that they were having
        concerns for Joshua's diminished quality of life while in the back brace.

32.     Also during this visit, Dr. Durrani told Plaintiffs that the bracing was not worth
        Joshua's diminution in quality of life.

33.     Also during the visit, Dr. Durrani did another set of x-rays and determined that the
        brace also did not help straighten his back.

34.     Dr. Durrani determined that the brace would most likely not improve Joshua's

curvature

35.      Dr. Durrani explained that spinal rod surgery was the Plaintiff's next option.

36.      Dr. Durrani decided to wait another 6 months to see if any additional changes occurred with Joshua's back.

37.      In August 2008, Plaintiffs went back to see Dr. Durrani.

38.      At this appointment Dr. Durrani took another set of x-rays and determined that Joshua was going to need to have surgery to fix the curvature in his spine.

39.      Dr. Durrani told Plaintiffs, "I can fix him."

40.      Dr. Durrani explained to the Plaintiffs that having this surgery would straighten Joshua's spine by pushing Joshua's hips forward, which would help with his walking and his head placement.

41.      Having been given this information from Dr. Durrani, Plaintiffs scheduled Joshua's surgery.

42.      Plaintiffs wanted Joshua to miss as little school as possible, so the surgery was scheduled while Joshua was on Thanksgiving break.

43.      The surgery was scheduled for Monday, November 24, 2008 at 7:30 AM.

44.      In October and November 2008 Joshua went through pre-op appointments with Cardiology, Pulmonary, and Anesthesiology. Joshua also had blood work done, a pre-op physical and finally a pre-op visit with Dr. Durrani.

45.      When Plaintiffs went to meet with Dr. Durrani for Joshua's pre-op visit, the office did not have Joshua scheduled for an appointment even though Plaintiffs had an appointment sheet from his scheduling nurse.

46.      When Plaintiffs were finally able to meet with Dr. Durrani, they discussed

recovery time, pain, additional bracing, the length of Joshua's hospital stay, the length of surgery and after surgery expectations.

47.     Dr. Durrani told Plaintiffs that Joshua would be in the hospital approximately 3-5 days.

48.     Dr. Durrani told Plaintiffs that Joshua would be in a lot of pain due to the muscles learning a new position.

49.     Dr. Durrani told Plaintiffs that Joshua would be out of school for 6 weeks.

50.     Dr. Durrani told Plaintiffs that Joshua would not need bracing after surgery.

51.     Dr. Durrani told Plaintiffs that Joshua would require physical therapy 12 weeks after surgery.

52.     Dr. Durrani told Plaintiffs that Joshua's surgery would last 4- 6 hours.

53.     The week before surgery, Joshua's scheduling nurse called Plaintiffs to ask to change the date of Joshua's surgery to one week later than originally scheduled.

54.     Plaintiffs did not agree to this change because they had already scheduled off work and made arrangements with family members to help with Joshua's recovery.

55.     Plaintiffs were called again by Joshua's scheduling nurse and asked if they would change the date of Joshua's surgery to Tuesday, November 25, 2008 at 7:30 AM.

56.     Plaintiffs agreed to this new surgery date.

57.     On the day of the surgery, Joshua suffered a severe rash caused by the antibiotic.

58.     During his stay at the hospital, Joshua also developed a severe allergic reaction to the surgical bandages.

59.     Plaintiffs repeatedly asked the nursing staff about the rash, but the nurses referred

the issue to the doctors.

60.    The rash was not attended to until the end of Joshua's hospital stay when the orthopedic residents finally came in and changed his bandages.

61.    Also during his stay Joshua suffered a spiking fever and diarrhea. Medical professionals could not explain the cause of the diarrhea.

62.    Joshua was subject to multiple uncomfortable blood tests because of the diarrhea.

63.    During Joshua's stay, Dr. Durrani told Plaintiffs that he wanted Joshua up and walking as soon as possible after surgery.

64.    Plaintiffs attempted to take Joshua out of his room to take him to the activity room, as Dr. Durrani had instructed.

65.    As Plaintiffs were on their way to the activity room, they were chased down by a nurse who told Plaintiffs that Joshua was not allowed out of his room since he was under quarantine due to his diarrhea.

66.    Joshua spent 6 days in the hospital after surgery.

67.    Throughout the 6 days in the hospital, Dr. Durrani only saw Joshua two times for a total of 10 minutes.

68.    In those 10 minutes Dr. Durrani only took a quick look at Joshua's back.

69.    Joshua was discharged on the sixth day.

70.    Immediately after being discharged from the hospital, Plaintiffs noticed extremely pronounced protrusions in Joshua's back; as if the rods were going to rip through Joshua's skin.

71.    Due to Joshua's disabilities, Joshua cannot communicate his pain level.

72.    Two weeks after Joshua's surgery, Plaintiffs went back to Children's Hospital for

a follow up visit with Dr. Durrani.

73. During this visit, Dr. Durrani ordered another set of x-rays taken.

74. During the same visit, Plaintiffs expressed their deep concern for the visibly noticeable and extremely pronounced protrusions at the base of Joshua's neck and lower back.

75. The rods impaired Joshua's physical abilities and Joshua did not live a normal life with the protrusions in his back.

76. Dr. Durrani told Plaintiffs that the protrusions were just swelling from the surgery and that Plaintiffs should expect it to go away.

77. The protrusions did not diminish.

78. After this appointment, Plaintiffs could not make a follow up appointment with Dr. Durrani because he was in the process of leaving Children's Hospital to open his own private practice.

79. Under information and belief, Defendant Durrani is an employee, agent, servant, member or owner of Defendant CAST.

80. Under information and belief, Defendant Durrani was asked to leave Defendant Children's Hospital.

81. Under information and belief, Defendant Children's Hospital had received previous complaints about Defendant Durrani.

82. Plaintiffs were told to call at the beginning of the New Year to schedule an appointment for a four-month follow up.

83. In January, Plaintiffs called Dr. Durrani's new office and were told to come back in April 2009 to Dr. Durrani's new offices at Deaconess Medical Building.

84.     In late March, Plaintiffs called to confirm Joshua's appointment and Joshua was, once again, not on the schedule.

85.     After much pleading, the office did work Joshua into Dr. Durrani's schedule as originally planned.

86.     Plaintiffs felt that Dr. Durrani was more concerned with starting his new private practice than with the health and safety of Joshua.

87.     When Plaintiffs arrived at Dr. Durrani's new office, they were told to go over to Deaconess Hospital for additional x-rays.

88.     After x-rays were taken, Plaintiffs met with Dr. Durrani to review how Joshua's recovery was progressing, if at all.

89.     Plaintiffs again addressed their extreme concern for the protrusions in Joshua's back since they were not diminishing; this was more than 4 months after surgery.

90.     Dr. Durrani told Plaintiffs that there were complications with the rods. Specifically, that the rods were 'rolling'.

91.     Dr. Durrani told Plaintiffs the complication could be repaired, but Dr. Durrani dismissed the need to go in and fix the rods.

92.     Dr. Durrani told Plaintiffs that he had just come back from a conference where it was decided that it was not in the best interest of the child to go in after 6 months to lengthen the rods.

93.     The appointment was extremely rushed and Plaintiffs did not have their questions answered.

94.     Plaintiffs had no choice but to schedule another follow up with Dr. Durrani for October 22, 2009—almost 11 months from his original surgery date.

95.      Joshua's initial surgery was an extreme strain on the Plaintiffs' family and marriage.

96.      Joshua was not able to participate in Special Olympics.

97.      Joshua was not able to participate in Miracle League baseball.

98.      Plaintiffs had to notify everyone who Joshua comes in contact with throughout the day that Joshua's back could not sustain any jarring motions because the rods would rupture through his skin and cause spinal injury.

99.      In August 2009 Joshua went to see his pediatrician, Dr. Ciambarella, for his yearly check up.

100.      Upon examination of Joshua's back, Dr. Ciambarella expressed major concern.

101.      Dr. Ciambarella told plaintiffs he had never seen this amount of protrusion in a growth rod surgery.

102.      Dr. Ciambarella recommended that Plaintiffs get another opinion about Dr. Durrani's insertion of the hardware into Joshua's back.

103.      That day, Plaintiffs went home and called Children's Hospital to schedule an appointment with another spinal doctor.

104.      In September 2009, Plaintiffs took Joshua to an appointment with the new spinal doctor–Dr. Steve Agabegi.

105.      Dr. Agabegi ordered new x-rays taken.

106.      Dr. Agabegi reviewed the original x-rays and the new x-rays of Joshua's back and expressed deep concern to Plaintiffs about the protrusions from the hardware.

107.      Dr. Agabegi told Plaintiffs that 4 of the 10 screws were coming out of Joshua's spine in a fashion called "plowing."

108.     Dr. Agabegi explained that this complication could potentially do permanent damage to Joshua's spinal cord.

109.     Dr. Agabegi told Plaintiffs that the rods in Joshua's back would have to come out immediately, and that postposing the surgery was not an option.

110.     Dr. Agabegi told Plaintiffs that the surgery performed on Joshua, should never have been performed.

111.     Dr. Agabegi explained to Plaintiffs that the surgery Joshua received was designed for a child with scoliosis, not kyphosis.

112.     Dr. Agabegi told Plaintiffs that he would not be putting anymore additional hardware in Joshua's back.

113.     Dr. Agabegi told Plaintiffs that he would continue to follow Joshua's progress and that he would look at the options to fix Joshua's kyphosis when Joshua was finished growing.

114.     Dr. Agabegi took digital pictures of Joshua's back and asked his nurse to come in and start the process of scheduling Joshua's surgery to remove the hardware put in by Dr. Durrani.

115.     A week later, Darlene at Children's Hospital scheduled the surgery to take out the hardware in Joshua's back.

116.     The surgery was scheduled for October 15, 2009.

## COUNT I - NEGLIGENCE OF DOCTOR DURRANI

117.     Plaintiffs incorporate by reference each and every allegation contained within the above paragraphs.

118.     Defendant Dr. Abubakar Atiq Durrani owed his patient, Joshua Roy and his

parents, Jeff and Debbie Roy, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

119.     Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, the negligent diagnosis, medical mismanagement and mistreatment of Joshua Roy, including but not limited to improper selection for surgery, improper performance of the surgery and installation of hardware, and improper follow up care addressing a patient's concerns.

## COUNT II - NEGLIGENCE OF CAST

120.     Plaintiffs incorporate by reference each and every allegation contained within the above paragraphs and further state:

121.     Defendant CAST owed its patient, Joshua Roy, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

122.     Defendant CAST breached that duty by failing to exercise the requisite degree of skill, care, and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, its negligent medical mismanagement, negligent diagnosis and mistreatment of Plaintiff.

123.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant, Plaintiffs sustained severe

and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT III - VICARIOUS LIABILITY OF CAST

124. Plaintiffs incorporate by reference each and every allegation contained within the above paragraphs and further state:

125. At all times relevant, Defendant Dr. Durrani was a shareholder, director, officer, agent, and/or employee of CAST.

126. Defendant Dr. Durrani was performing within the scope of his employment when dealing with the Plaintiffs regarding the care of Joshua Roy.

127. Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

128. Defendant CAST is vicariously liable for the negligent acts of Defendant Dr. Durrani alleged in this Complaint.

129. As a direct and proximate result of Defendant CAST's actions, Plaintiffs sustained harm.

## COUNT IV - NEGLIGENT SUPERVISION BY
## CINCINNATI CHILDREN'S HOSPITAL

130. Plaintiffs incorporate by reference each and every allegation contained within the above paragraphs and further state:

131. Defendant Cincinnati Children's Hospital was responsible for the conduct of its residents, doctors, nurses and those doctors with privileges at the Hospital.

132.     Defendant Cincinnati Children's Hospital was in a unique position to control the actions of the residents, doctors, nurses and those with privileges, and owed a duty to Plaintiffs to exercise said control.

133.     Defendant Cincinnati Children's Hospital breached this duty to Plaintiffs by not controlling the actions of the residents, doctors, nurses, and those with privileges, during the medical treatment of Joshua Roy.

134.     As a direct and proximate result of the failure to properly supervise medical treatment by the residents, doctors, nurses, and those with privileges by Cincinnati Children's Hospital, Plaintiffs have suffered severe and grievous injuries.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants on all claims. Plaintiffs further request:

1.     Costs associated with the disbursement of this action;
2.     Interests;
3.     Punitive damages;
4.     Reasonable attorney's fees;
5.     All compensatory damages;
6.     Trial by jury; and
7.     All other relief this court deems fitting and proper.

Respectfully submitted,

Eric C. Deters (38050)
Gregory A. Keyser (0037678)
Eric C. Deters & Associates
5247 Madison Pike
Independence, KY 41051
(859) 363-1900
(859) 363-1444 (fax)
Eric@ericdeters.com

## JURY DEMAND

Plaintiffs respectfully request a trial by jury.

Eric C. Deters (38050)
Gregory A. Keyser (0037678)

## CERTIFICATION OF EXPERT REVIEW

The undersigned certifies that this matter has been reviewed by competent health care providers who are qualified to testify, and are willing to support the allegations made in the Complaint.

Eric C. Deters (38050)
Gregory A. Keyser (0037678)

### Affidavit of Merit

I, Keith D. Wilkey, M.D., after bring duly sworn and cautioned state as follows:

1.      I have reviewed all relevant medical records reasonably available about Joshua Roy concerning the allegations of medical negligence.

2.      I am familiar with the applicable standard of care.

3.      Based upon my review of this record, my education, my training, and experience, it is my belief, to a reasonable degree of medical probability that the care provided by the Defendant Abubakar Durrani, M.D. was negligent and this negligence caused injury to Joshua Roy.

4.      I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or to its instruction in an accredited school.

5.      My curriculum vitae is attached.

**FURTHER AFFIANT SAITH NAUGHT.**

_Keith D. Wilkey, M.D._

STATE OF _Missouri_                )
                                                    )
COUNTY OF _St. Charles_      )

        **SUBSCRIBER, SWORN TO AND ACKNOWLEDGED,** before me, a Notary Public, by Keith D. Wilkey, M.D. on the _17_ day of _October_, 2011.

_Angela Kay Poinsett_
Notary Public

My Comm. Exp _07/18/2015_

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11133613

Brenda Shell Complaint

FILED

2011 SEP -8 PM 3: 58

MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS

**COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO
CIVIL DIVISION**

CV

2011 09 3163

MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS

**BRENDA S. SHELL**
6387 Branchhill-Miamiville Road
Loveland, Ohio 45140

CASE NO:

and

**JOHN SHELL**
6387 Branchhill-Miamiville Road
Loveland, Ohio 45140

Plaintiffs,

vs.

**CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC.**
4555 Lake Forest Dr., Suite 150
Cincinnati, OH 45242
**Please Also Serve Statutory Agent:**
C.T. Corporation Systems
130 East Ninth St., Suite 1010
Cleveland, OH 44114

<u>VERIFIED COMPLAINT with JURY
DEMAND and DECLARATORY
JUDGMENT</u>

**ABUBAKAR A. DURANNI, M.D.**
4555 Lake Forest Dr., Suite 150
Cincinnati, OH 45242

**WEST CHESTER MEDICAL CENTER,
INC.**
7700 University Drive
West Chester, Ohio 45069
**Please Also Serve Statutory Agent:**
C.T. Corporation Systems
130 East Ninth St., Suite 1010
Cleveland, OH 44114

**UC HEALTH**
**Serve Statutory Agent:**
C.T. Corporation Systems
130 East Ninth Street
Cleveland, OH 44114

**JON HUSTED**
**OHIO SECRETARY OF STATE**
180 East Broad Street
Columbus, OH 43215

2011 09 3163

......... .... SWAIN
BUTLER COUNTY
CLERK OF COURTS

        Defendants.

    Now come Plaintiffs, Brenda S. Shell and John Shell, by and through counsel,

and for their Complaint, state as follows:

**PARTIES**

    1.    Plaintiffs, Brenda Shell ("B. Shell") and John Shell ("J. Shell") are married

residents of Clermont County, Ohio.

    2.    At all times relevant herein, Center For Advanced Spine Technologies,

Inc. ("Center") is and was a duly licensed corporation organized and existing under the

laws of the State of Ohio and having its principal place of business located at 4555 Lake

Forest Dr., Suite 150, Cincinnati, Ohio 45242. The statutory agent for Center For

Advanced Spine Technologies, Inc. is CT Corporation System, whose mailing address is

1300 East Ninth Street, Suite 1010, Cleveland, Ohio 44114.

    3.    At all times relevant herein, Defendant Abubakar A. Duranni, M.D., who

is also known as A. Atiq Duranni, M.D. ("Dr. Duranni"), was a duly licensed physician

2

in the State of Ohio, and was a physician who provided surgical care and treatment to

Brenda Shell on March 2, 2010 through May 27, 2010. Defendant Dr. Duranni a

representative of Defendant Center through which he provided medical services to

Plaintiff B. Shell.

4.     At all times relevant herein, West Chester Medical Center, Inc. (aka West

Chester Hospital) is and was a duly licensed corporation organized and existing under

the laws of the State of Ohio and having its principal place of business located at 7700

University Drive, West Chester, Ohio 45069. The statutory agent for West Chester

Medical Center, Inc. is CT Corporation System, whose mailing address is 1300 East

Ninth Street, Cleveland, Ohio 44114.

5.     At all times relevant herein, UC Health, Inc. ("UC Health") is and was a

duly licensed corporation organized and existing under the laws of the State of Ohio

and having its principal place of business located in the City of Cincinnati, County of

Hamilton, State of Ohio, which consist of multiple hospitals, including West Chester

Hospital, which share certain services, profits, and liabilities. The statutory agent for

UC Health, Inc. is CT Corporation System, whose mailing address is 1300 East Ninth

Street, Cleveland, Ohio 44114.

6.     At all times relevant herein, West Chester Medical Center, Inc., aka West

Chester Hospital held itself out to the public, and specifically to Brenda Shell, as a

hospital providing competent and qualified medical and nursing services, care and

3

treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

2011 09 3163

BUTLER
CLERK OF COUNTY
COURTS

7.     At all times relevant herein, Center For Advanced Spine Technologies, Inc., held itself out to the public, and specifically to Brenda Shell, as an association providing competent and qualified medical, nursing and surgical services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

8.     At all times relevant herein, Dr. Duranni was an agent, servant, and/or employee of West Chester Medical Center, Inc. aka West Chester Hospital and/or UC Health, Inc. and/or Center For Advanced Spine Technologies, Inc., and was acting within the course and scope of his agency and/or employment at the time of his care and treatment of Brenda Shell.

9.     At all times relevant herein, Dr. Duranni was the supervising attending physician(s) when care and treatment was provided to Brenda Shell.

10.     At all times relevant, Plaintiff Brenda Shell specifically informed Defendant Duranni that she did not permit any other physician, including interns and resident medical students for any purpose, to participate or be present in any operation procedures that related to her care.

11.     At all times relevant herein, Center For Advanced Spine Technologies, Inc., West Chester Medical Center, Inc. aka West Chester Hospital, and UC Health are

4

responsible for providing competent and qualified medical and nursing services, care
and treatment by and through its physicians, physicians in training, residents, nurses,
agents, ostensible agents, servants and/or employees to Plaintiff Brenda Shell."

2011  09  3163

BUTLER COUNTY
CLERK OF COURTS

12.     On March 10, 2011, Plaintiffs notified the Defendants Center For
Advanced Spine Technologies, Inc. and Abubakar A. Duranni, M.D., aka A. Aqit
Duranni, M.D. by certified mail pursuant to section 2305.113 that Plaintiffs were
considering bringing this action against them.

13.     Plaintiffs seek leave of thirty days to attach an Affidavit of Merit to this
Complaint as Exhibit A.

## COUNT ONE
### (Negligence)

14.     Plaintiffs hereby incorporate by reference all of the allegations and
averments set forth above as if fully rewritten herein.

15.     On or about March 12, 2010, B. Shell underwent surgery at West Chester
Medical Center, Inc. aka West Chester Hospital for a loose screw.

16.     Surgery was performed by Dr. Duranni and/or other physicians,
physicians in training, residents, nurses, agents, ostensible agents, servants and/or
employees of West Chester Medical Center, Inc., UC Health and/or Center For
Advanced Spine Technologies, Inc.

17.     Dr. Duranni undertook the responsibility of supervising, caring for and
treating Brenda Shell with accepted and recognized standards of care for physicians

5

and nurses, and owed her a duty to provide care and treatment within the accepted and recognized standards.

18.    On the above date and time, the procedure was done by the attending physicians Dr. Duranni.  At the end of the procedure, during the closing of the incision, Dr. Duranni and/or another physician, physician in training, resident, agent, ostensible agent, servant and/or employee, failed to observe a dural tear, thereby temporarily and permanently injuring Brenda Shell and John Shell.

19.    Immediately upon Brenda Shell's waking from the anesthesia and laying on her back for 24 hours, she complained of a foot drop that did not exist prior to the surgery.

20.    At the same time, Brenda Shell suffered from severe headaches.

21.    Throughout the course of the three days, Brenda Shell continued to complain of severe headaches and the drop foot.  She further indicated that she was unable to neither move her left leg properly nor walk.  None of these symptoms existed prior to the surgery.

22.    On or about March 19, 2010, Dr. Duranni performed exploratory surgery. At that time, it was found Brenda Shell suffered from a dural leak to which a dural patch was applied, which Dr. Duranni described as a hematoma.

23.    Dr. Duranni performed an irrigation and debridement and repair of the dura L4-L5, L5-S1 wound.

24.    Subsequently, Brenda Shell suffered from fever and was determined to be toxic.

25.    Dr. Duranni caused Brenda Shell to be returned to surgery for a third time, whereupon it was discovered she had purulent material in the wound site.

26.    Dr. Duranni performed a lumbar laminectomy of L4-L5 and L5-S1 with a dural repair.

6

27.     Through a series of laboratory tests it was determined that Brenda Shell was diagnosed with an infection.

28.     Brenda Shell was treated with vancomycin through a PICC line.

29.     Dr. Duranni discharged Brenda Shell for the Drake Center for rehabilitation and further antibiotic therapy.

30.     West Chester Medical Center, Inc., UC Health and/or Center for Advanced Spine Technologies, Inc., are liable under the doctrine of respondent superior and/or apparent agency and/or agency by estoppel for the negligence of the nurses and physicians caring for Brenda Shell whether employees, agents or servants, West Chester Medical Center, Inc., UC Health and/or Center for Advanced Spine Technologies, Inc. were negligent or deviated from the accepted standards of care in the failure to properly train residents, nurses, and other health care providers in providing surgical treatment, treatment and care to a patient such as Brenda Shell.

31.     West Chester Medical Center, Inc., UC Health and/or Center for Advanced Spine Technologies, Inc., through their agents and employees, were negligent and deviated from the standards of care in the failure to have policies, procedures and protocols in place that would protect patients from allowing a dura tear, dural leak, and infection, despite Brenda Shell showing classic symptoms.

32.     As a direct and proximate result of the negligence of the Defendants, Brenda Shell was temporality, permanently, and severally injured, causing significant pain and suffering, mental anguish, emotional distress and severe emotional distress.

33.     As a direct and proximate result of the negligence of the Defendants, Brenda Shell incurred additional medical expenses and will continue to incur additional medical expenses.

34.     As a direct and proximate result of the negligence of the Defendants, Brenda Shell has endured severe physical pain, physical pain and emotional suffering.

7

35.     As a direct and proximate result of the negligence of the Defendants, Brenda Shell has endured a significant loss of the enjoyment of life and will continue to endure a significant loss of the enjoyment of life.

BUTLER COUNTY
CLERK OF COURTS

## COUNT TWO
### (Negligence)

36.     Plaintiffs hereby incorporate by reference all of the allegations and averments set forth above as if fully rewritten herein.

37.     As a direct and proximate result of the Defendant's negligence acts and/or admissions and/or reckless conduct, Defendants and their agents, ostensible agents, servants and/or employees breached their duty of care and treatment to Brenda Shell by failing to exercise an appropriate degree of skill, care, and diligence required of them and failing to provide Brenda Shell with surgical, medical and nursing care ordinarily used by physicians, surgeons, physicians in training, resident physicians, hospitals, nurses and/or other care providers in the like and similar circumstances.

38.     Defendants, their agents, ostensible agents, servants and/or employees providing care and treatment to Brenda Shell that fell below accepted standards of care required of physicians, surgeons, hospitals, nurses and/or other care providers in the care and treatment provided to Brenda Shell, on that failure to follow the accepted standards of care was negligent, unreasonable, and reckless.

39.     As a direct and proximate result of the negligence and reckless conduct of the Defendants, their agents, ostensible agents, servants and/or employees, Brenda Shell suffered pain, discomfort, disfigurement, mental and emotional distress, depression, medical expenses, therapy expenses, exercise expenses, medical apparatus expenses and expects to incur continuing and ongoing damages and expenses in the future.

40.     At all times relevant herein, Plaintiffs Brenda Shell and John Shell were legally married and living together as husband and wife.

8

41.     As a direct and proximate result of the negligence and reckless conduct of the Defendants, their agents, ostensible agents, servants and/or employees, John Shell suffered and will continue to suffer in the future loss of his wife's affection, guidance, support, consortium, services, care, assistance, society, companionship, his own emotional distress, mental anguish, the loss of the enjoyment of life and other pecuniary and non-pecuniary loss and expects to suffer and incur continuing and ongoing damages in the future.

### COUNT THREE

42.     Plaintiffs hereby incorporate by reference all of the allegations and averments set forth above as if fully rewritten herein.

43.     West Chester Medical Center, Inc., and/or UC Health, and/or Center for Advanced Spine Technologies, Inc. are ostensibly liable, vicariously liable, and/or liable under the theory of respondent superior, apparent agency, and/or agency by estoppel for any and all negligent acts and/or omissions of Dr. Duranni and other nurses, physicians and/or employees who provided care and treatment to Brenda Shell.

### COUNT FOUR

44.     Plaintiffs hereby incorporate by reference all of the allegations and averments set forth above as if fully rewritten herein.

45.     Defendants, their agents, ostensible agents, servants and/or employees failed in their duty that was owed to Brenda Shell to provide her care and treatment that a reasonable physician and/or surgeon and/or nurse would provide to a patient under like or similar circumstances.

46.     Defendants, their agents, ostensible agents, servants and/or employees breached that duty when they caused a dura tear and leaks and purulent material to

9

engage in the patients wound site and failed to recognize the symptoms for two days, causing additional and unnecessary pain, suffering, and damage to Brenda Shell.

47.    The Defendants performed portions of the March 12, 2010 surgery and subsequent surgeries against the informed consent given by Brenda Shell.

48.    This unreasonable conduct demonstrates conscious disregard and recklessness for the rights and well being of Brenda Shell.

49.    As a direct and proximate result of the reckless conduct of the Defendants, Brenda Shell incurred significant pain, injury, emotional distress, severe emotional distress, mental anguish, and suffering on a temporary and permanent basis.

## COUNT FIVE – SUBROGATION

50.    Plaintiffs hereby incorporate by reference all of the allegations and averments set forth above as if fully rewritten herein.

51.    At all times relevant herein, Plaintiff Brenda Shell was insured with a policy of health insurance with Anthem Blue Access, which has paid some or all of her medical bills and which may insert a claim of subrogation.

## COUNT SIX – UNCONSTITUTIONALITY OF O.R.C. § 2323.43 and CIVIL RULE 10

52.    Plaintiffs hereby incorporate by reference all of the allegations and averments set forth above as if fully rewritten herein.

53.    To the extent that O.R.C. § 2323.43 applies to this action, it is in violation of both the Ohio and United States Constitutions.

54.    Under the Ohio Civil Rules of Procedure, the required "Affidavit of Merit" is an unconstitutional impediment and constitutes a denial of Due Process and Equal Protection to medical malpractice Plaintiffs such as the Shell's.

55.    The Secretary of State has been named as a party regarding the unconstitutional aspects of the above law and rule.

10

## COUNT SEVEN – BREACH OF CONTRACT

56.     Plaintiffs hereby incorporate by reference all of the allegations and averments set forth above as if fully rewritten herein.

57.     Plaintiffs contracted with Defendants Abubakar A. Duranni, M.D., who is also known as A. Atiq Duranni, M.D. and Center For Advanced Spine Technologies, Inc. to perform services to repair a L5-S1 axial LIF and bilateral foraminotomies.

58.     As a part of the contract with the Defendants, it was specified by Plaintiffs that no interns or residents were to participate or observe said L5-S1 axial LIF and bilateral foraminotomies.

59.     Defendants breached their contractual duties by allowing interns to participate during the course of the delivery of the contracted services.

60.     As a result of said breach of contract, Plaintiffs have suffered severe and permanent damages.

61.     As a result of Defendants willful and wanton disregard of the terms of the contract, said intentional act was done in complete disregard for the safety of the Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally for that amount of money which will fully and fairly compensate them for their loss but in excess of $1,500,000.00 for compensatory damages and $2,500,000.00 for punitive damages (if available), together with costs, interest, expenses, attorneys' fees, and any and all other relief that they may be legally or equitably entitled.

11

Respectfully submitted,

F. HARRISON GREEN CO., L.P.A.

F. Harrison Green, Trial Attorney for
Plaintiffs Brenda Shell and John Shell
Ohio Supreme Court Reg. #0039234
Executive Park, Suite 230
4015 Executive Park Drive
Cincinnati, Ohio 45241
Tel. (513) 769-0840
Fax (513) 563-2953
Email: fhgreen@fuse.net

## JURY DEMAND

Plaintiffs further request a trial by a jury of their peers in this matter.

F. Harrison Green
Trial Attorney for Plaintiffs

## **VERIFICATION**

State of Ohio
County of Hamilton, SS:

2011 09 3163

BUTLER COUNTY
CLERK OF COURTS

I, BRENDA S. SHELL, have read the above statements and believe them to be true to the best of my knowledge.

*Brenda S. Shell*

BRENDA S. SHELL

Before me a Notary Public in and for said State personally appeared Brenda S. Shell and did sign and swear to the foregoing statements on this the _7th_ day of September, 2011.

*Lisa S. Kettlehake*

Notary Public

LISA S. KETTLEHAKE
Notary Public, State of Ohio
My Commission Expires April 26, 2014

13

## VERIFICATION

State of Ohio
County of Hamilton, SS:

    I, JOHN SHELL, have read the above statements and believe them to be true to the best of my knowledge.

_John Shell_
JOHN SHELL

    Before me a Notary Public in and for said State personally appeared John Shell and did sign and swear to the foregoing statements on this the _7th_ day of September, 2011.

_Lisa S. Kettlehake_
Notary Public

LISA S. KETTLEHAKE
Notary Public, State of Ohio
My Commission Expires April 26, 2014

14

Carol Wilson Complaint

Eric C. Deters (0038050)

# IN THE COURT OF COMMON PLEAS
## BUTLER COUNTY, OHIO
### CIVIL DIVISION

| | | |
|---|---|---|
| CAROL WILSON | : | |
| 920 Blackstone Street | : | Case No. |
| Washington Court House, Ohio 43160 | : | |
| | | Judge |
| | : | |
| Plaintiff | : | |
| | : | **COMPLAINT & JURY DEMAND** |
| | : | |
| v. | | |
| | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| 4555 LAKE FOREST DR., Suite 150 | : | |
| CINCINNATI, OH 45242 | : | |
| (Serve via Certified Mail) | : | |
| | : | |
| And | : | |
| | : | |
| CENTER FOR ADVANCED SPINE | : | |
| TECHNOLOGIES, INC. | : | |
| 4555 Lake Forest Drive, Suite 150 | : | |
| Cincinnati, Ohio 45242 | : | |
| | : | |
| SERVE: CT CORPORATION SYSTEM | : | |
| 1300 EAST 9TH STREET, SUITE 1010 | : | |
| CLEVELAND, OHIO 44114 | : | |
| (Serve via Certified Mail) | : | |
| | : | |
| And | : | |
| | : | |
| WEST CHESTER HOSPITAL, LLC | : | |
| 7700 UNIVERSITY DRIVE | : | |
| WEST CHESTER, OH 45069 | : | |
| | : | |
| SERVE: GH&R BUSINESS SVCS., INC. | : | |
| 511 WALNUT STREET | : | |
| 1900 FIFTH THIRD CENTER | : | |
| CINCINNATI,OH 45202 | : | |
| | : | |
| And | : | |
| | : | |
| UC HEALTH | : | |

1

Serve: CT Corporation System       :
1300 East 9th St. Ste 1010        :
Cleveland, OH 44114         :
(Serve via Certified mail)

                                 :
           Defendants.       :

                                 :

Now comes Plaintiff, Carol Wilson and for her Complaint with Jury Demand, states as follows:

## PARTIES, JURISDICTION AND VENUE

1. The incident giving rise to this action occurred in Butler County, Ohio.

2. At all times relevant, Plaintiff Carol Wilson ("Plaintiff") was an individual resident and citizen of Fayette County, Washington Court House, Ohio.

3. At all times relevant, Defendant Dr. Abubakar Atiq Durrani ("Durrani") was licensed to and did in fact practice medicine in the State of Ohio and Kentucky.

4. At all times relevant, Center for Advanced Spine Technologies, Inc. ("CAST"), was licensed to and did in fact perform medical services in the State of Kentucky, and was and is a corporation authorized to transact business in the State of Kentucky.

5. At all time relevant, West Chester Hospital ("West Chester"), registered at the time of the incident as West Chester Medical Center, was a corporation authorized to transact business and perform medical services in the State of Ohio.

6. At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which included, owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

2

7. At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

8. The amount in controversy exceeds the jurisdictional threshold of this Court.

9. The subject matter of the Complaint arises out of medical treatment by the Defendants in Butler County, Ohio and Kenton County, Kentucky.

## BACKGROUND

10. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

11. Plaintiff Carol Wilson had ongoing back pain and sought treatment with Dr. Durrani at CAST in July 2009.

12. On December 1, 2010 Dr. Durrani performed Surgery was for Lumbar Disc Degeneration to correct spinal stenosis on Carol Wilson at West Chester Hospital.

13. Despite the surgery, Plaintiff suffered increased pain, and was provided no relief from her ongoing pain.

14. Plaintiff informed Dr. Durrani that her symptoms has worsened, and relied upon his advice and treatment.

15. Dr. Durrani led Plaintiff to believe the surgery was not the cause of her increased pain and symptoms.

3

16. On or about December 7, 2011, Dr. Durrani performed a second spine surgery, an L5-S1 TLIF with extension of fusion and left sided foramenotomy on Plaintiff at West Chester Hospital.

17. Immediately thereafter, Plaintiff experienced new symptoms of numbness of the bottom portion of her left leg, and experienced extreme pain in the lower left back, which was new.

18. Plaintiff again informed Dr. Durrani that her symptoms has worsened, and relied upon his advice and treatment.

19. Dr. Durrani led Plaintiff to believe the neither the first or second surgery were not the cause of her increased pain and symptoms. Durrani said it was not the surgery but a pinched nerve.

20. On or about June 18, 2012, Dr. Durrani performed a third spine surgery consisting of left L3-L4 hemi-lamenectomy/foramenectomy and left L5-S1 hemi-lamenectomy/foramenectomy on Plaintiff at West Chester Hospital.

21. Plaintiff again informed Dr. Durrani that her symptoms has worsened and that since the third surgery both sides of her body are in constant pain and Plaintiff now has numbness in the front of her left leg with no reflexes.

22. Dr. Durrani led Plaintiff to believe the neither the first, second, or third surgery were not the cause of her increased pain and symptoms. Durrani told Plaintiff again it is not the surgeries, but rather the cause of her pain and numbness was a new problem with the SI (sacraliliac) joint.

23. Dr. Durrani scheduled Plaintiff for a fourth surgery to occur in January 2013.

24. Plaintiff no longer trusted Dr. Durrani's care, advice and treatment.

4

25. On January 3, 2012, Plaintiff's primary care physician Dr. John Merling referred Plaintiff to Dr. Cohen at the Mayfield Clinic.

26. On January 28, 2013 an MRI was performed at Mayfield Clinic.

27. On February 8, 2013, Dr. Cohen informed Plaintiff that the surgeries performed by Dr. Durrani were unnecessary.

## COUNT I: NEGLIGENCE – DOCTOR DURRANI

28. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

29. Defendant Durrani owed his patient, Carol Wilson, the duty to exercise the degree of skill, care, and diligence of an ordinary prudent health care provider would have exercised under like or similar circumstances.

30. Defendant Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinary prudent health care provider would have exercised under same or similar circumstances through, among othis things, the negligent diagnosis, medical mismanagement and mistreatment of Carol Wilson, including but not limited to unnecessary surgery, failed surgery, improper performance of surgery, and improper follow up care addressing the patient's concerns.

31. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of the ability to

5

perform usual and customary activities and incurred substantial medical expenses
and treatment.

## COUNT II: NEGLIGENCE - CAST

32. Plaintiff incorporates by reference each and every allegation in the paragraphs
above.

33. Defendant CAST owed its patient, Carol Wilson, the duty to exercise the degree
of skill, care, and diligence an ordinarily prudent health care provider would have
exercised under like or similar circumstances.

34. Defendant CAST breached that duty by failing to exercise the requisite degree of
skill, care, and diligence that an ordinarily prudent health care provider would
have exercised under same or similar circumstances through, among other things,
its negligent medical mismanagement, negligent diagnosis and mistreatment of
Plaintiff.

35. As a direct and proximate result of the aforementioned negligence and deviation
from the standard of care on the part of the Defendant, Plaintiff sustained severe
and grievous injuries, prolonged pain and suffering, emotional distress,
humiliation, discomfort, loss of enjoyment of life, and loss of the ability to
perform usual and customary activities and incurred substantial medical expenses
and treatment.

## COUNT III: VICARIOUS LIABLITY - CAST

36. Plaintiff incorporates by reference each and every allegation in the paragraphs
above.

37. At all times relevant, Defendant Dr. Durrani was a shareholder, director, officer, agent, and/or employee of CAST.

38. Defendant Durrani was performing within the scope of his employment when dealing with the Plaintiffs.

39. Defendant CAST is responsible for harm caused by acts of employees for conduct that was within the scope of employment under the theory of respondeat superior.

40. Defendant CAST is vicariously liable for the negligent acts of Defendant Durrani alleged in this Complaint.

41. As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of the ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT IV: NEGLIGENT HIRING, RETENTION, CREDENTIALING & SUPERVISION – CAST, WEST CHESTER HOSPITAL & UC HEALTH

42. Plaintiff incorporates by reference each and every allegation contained within the above paragraphs and further state:

43. Defendants were was responsible for the hiring, credentialing, screening, oversight, and conduct of its residents, doctors, nurses and those doctors with privileges at the Hospital.

44. Defendants were in a unique position to control, monitor, and oversee the conduct and consequences of the residents, doctors, nurses and those with privileges, and owed a duty to Plaintiff to exercise said control.

7

45. Upon information and belief, Defendant Durrani had medical privileges terminated, revoked, suspended or acted upon negatively at his places of previous employment or places at which he held privileges, as a result of misconduct, substandard care, medical negligence and/or negative outcomes, including Children's Hospital and Christ Hospital.

46. Defendants owed a duty to its patients to exercise reasonable care in the hiring, selection, retention, supervision, monitoring, oversight and granting of privileges to physicians.

47. Defendants breached their duties by hiring and/or granting privileges to Defendant Durrani and allowing Defendant Durrani to maintain privileges, when they knew or should have known that Defendant Durrani was incompetent and/or that his privileges had been terminated, revoked, suspended or acted upon negatively at one or more of his previous places of employment or places at which he held privileges.

48. Defendants also breached this duty to Plaintiff by not controlling the actions of the residents, doctors, nurses, and those with privileges, during the medical treatment of Carol Wilson.

49. As a direct and proximate result of the failure to properly supervise medical treatment by the residents, doctors, nurses, and those with privileges at CAST and West Chester Hospital, Plaintiff suffered severe and grievous injuries.

**COUNT V: BATTERY - DEFENDANT DURRANI**

50. Plaintiff incorporates, adopt and allege as if fully restated herein, those allegations contained in the above paragraphs.

8

51. Defendant Durrani committed battery against the Plaintiff Carol Wilson by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent for Carol Wilson, and by the failure to provide this information to Plaintiffs.

52. Plaintiff would not have agreed to the surgery if they knew that the surgery was unnecessary and not indicated.

53. As a direct and proximate result of the aforementioned battery by Defendant, Plaintiff was caused to sustain severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, the loss of ability to perform usual and customary activities and Plaintiff has incurred and will continue to incur substantial medical expenses and treatment.

## COUNT VI: FRAUD - DURRANI , WEST CHESTER HOSPITAL & UC HEALTH

54. Plaintiff incorporates, adopts and alleges those allegations contained in the above paragraphs.

55. Defendants made material, false representations to Plaintiff, Carol Wilson and her insurance company in the course of the care and treatment of Carol Wilson, as outlined in this Complaint.

56. Such false representations include, inter alia, stating that the surgeries were imminently necessary; that the surgeries were medically necessary; that further conservative treatment was unnecessary and futile; that the surgeries would be simple; that the medical billing was accurate and medically indicated; and that as

9

a result of the surgeries, Carol Wilson would be relieved of her pain and symptoms.

57. Defendants knew or should have known such representations were false, and/or made the misrepresentations with such utter disregard and recklessness as to whether they were true or false that knowledge of their falsity may be inferred.

58. Defendants made the misrepresentations both before and after the surgeries mentioned herein with the intent of misleading Plaintiff into relying upon them.

59. Plaintiff justifiably relied upon the material misrepresentations of Defendants when making the decision to undergo and pay for the surgeries performed by Dr. Durrani.

60. As a direct and proximate result of the aforementioned, Plaintiff Carol Wilson did undergo three (3) surgeries to her detriment, which were paid for in whole or in part by her insurance company, and sustained grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and Plaintiff has incurred and will continue to incur substantial medical expenses and treatment.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

61. Plaintiff incorporates, adopts and re-alleges as if fully restated herein, those allegations contained in the above paragraphs.

62. Defendants intended to, and in fact, caused emotional distress to the Plaintiff.

63. Defendants' conduct was so extreme and outrageous as to go beyond the bounds of decency and was such that the conduct can be considered utterly intolerable in

a civilized society.

64. Defendants' conduct was the proximate and actual cause of the Plaintiff's psychiatric and emotional injuries, mental anguish, suffering, and distress.

65. The distress and anguish suffered by the Plaintiff is so serious and of a nature no reasonable man or woman could be expected to endure.

## COUNT VIII – VICARIOUS LIABILITY OF CAST, WEST CHESTER HOSPITAL & UC HEALTH

66. Plaintiff incorporates by reference each and every allegation contained within the above paragraphs and further state:

67. At all times relevant, Dr. Durrani was an agent, employee, and/or performed services at the direction of, and/or for the benefit of West Chester Hospital and UC Health.

68. Dr. Durrani was performing within the scope of his employment when dealing with the Plaintiffs and their insurance company regarding the care of Plaintiff.

69. Defendants are responsible for harm caused by acts of its agents and employees for conduct that were within the scope of employment under the theory of respondeat superior.

70. Defendants are vicariously liable for the acts and omissions of Defendant Dr. Durrani as alleged in this Complaint.

71. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff sustained grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and Plaintiff has

11

incurred and will continue to incur substantial medical expenses and treatment.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment against Defendants on all claims.
Plaintiff further request:

1. Costs associated with the disbursement of this action;

2. Interests;

3. Punitive damages, not to exceed $50,000,000.00 (fifty million dollars);

4. Reasonable attorney's fees;

5. All compensatory damages, not to exceed $5,000,000.00 (five million dollars);

6. Trial by jury; and

7. All other relief this court deems fitting and proper.

Respectfully submitted,

\s\ _Eric C. Deters_

Eric C. Deters (38050)
**ERIC. C. DETERS &**
**PARTNERS, PSC**
**5247 Madison Pike**
**Independence, KY 41051**
**Phone: (859) 363-1900**
**Fax: (859) 363-1444**
**eric@ericdeters.com**

## **JURY DEMAND**

Plaintiff hereby respectfully requests trial by jury on all issues.

Respectfully submitted,

_Eric C. Deters_

Eric C. Deters (0038050)
Attorney for Plaintiffs
5247 Madison Pike
Independence, KY 41051-7941
Phone: 859-363-1900  Fax: 859-363-1444
Email: eric@ericdeters.com

12

# Kenneth Wilson Complaint

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

**FILED**

JAN 12 2012

TRACY WINKLER
COMMON PLEAS COURT

KENNETH WILSON
3837 Morgan Court
Amelia, Ohio 45102

       Plaintiff

v.

ABUBAKAR ATIQ DURRANI, M.D.
4555 Lake Forest Drive
Suite 150
Cincinnati, Ohio 45242

      (Serve Certified Mail)

and

CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC.
4555 Lake Forest Drive
Suite 150
Cincinnati, Ohio 45242

      Serve: John E. Barnes
           255 East Fifth Street
           Suite 1900
           Cincinnati, Ohio 45202

      (Serve Certified Mail)

and

CINCINNATI CHILDREN'S HOSPITAL
MEDICAL CENTER
333 Burnett Avenue
Cincinnati, Ohio 45229

      Serve: Frank C. Woodside, III
           1900 Chemed Center
           255 E. Fifth Street
           Cincinnati, Ohio 45202

Judge:   A 1 2 0 0 2 6 4

COMPLAINT AND
JURY DEMAND

**(Serve Certified Mail)**

Comes now Plaintiff, Kenneth Wilson, and for his Complaint and jury demand states as follows:

## JURISDICTION

1.  At all times relevant, Plaintiff Kenneth Wilson, was a resident of and domiciled in the State of Ohio.

2.  At all times relevant, Defendant Dr. Abubakar Atiq Durrani was licensed to and did in fact practice medicine in the State of Ohio.

3.  At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio.

4.  At all times relevant, Cincinnati Children's Hospital Medical Center (hereinafter "Children's Hospital"), was a registered trade name for Children's Hospital Medical Center, a corporation authorized to transact business and perform medical services in the State of Ohio.

5.  Plaintiff attaches an Affidavit of Merit to this Complaint.

6.  The amount in controversy exceeds the jurisdictional threshold of this Court.

7.  The subject matter of the Complaint arises out of medical treatment by the Defendants in Hamilton County, Ohio. This Court is thus the proper venue to grant the Plaintiff the relief she seeks.

## BACKGROUND

8.    Plaintiff incorporates by reference each and every allegation contained within the above paragraphs further states:

9.    During junior highschool, Plaintiff Ken started experiencing back pain.

10.    Plaintiff was very active, playing football and baseball through school.

11.    Plaintiff saw Defendant Durrani through Children's Hospital.

12.    Defendant Durrani attempted several non-invasive treatments to treat Plaintiff's back pain.

13.    During the 2007 time frame, Defendant Durrani advised that Plaintiff would likely need surgery.

14.    Defendant Durrani and Plaintiff agreed that surgery would wait until after Plaintiff completed sports during college.

15.    During his treatment, Defendant Durrani ordered multiple radiological studies.

16.    None of these studies showed any herniated discs, bulging discs, degenerative effects, nor any fractures.

17.    On or about August 5, 2008, Defendant Durrani determined that Plaintiff suffered from an L5-S1 pars fracture.

18.    Radiological study from June 19, 2008 specifically states no fracture.

19.    Defendant Durrani scheduled Plaintiff for surgery.

20.    Defendant Durrani informed Plaintiff that he needed a fusion.

21.    On or about August 8, 2008, Defendant Durrani performed surgery on Plaintiff.

22.    During the surgery, Defendant Durrani installed bilateral facet screws in

the L5-S1.

23.        It is unclear from the operative report whether a fusion was attempted.

24.        Follow up radiological studies mention "incomplete bony fusion."

25.        Defendant Durrani performed follow up services and therapy for Plaintiff at Children's Hospital through the end of 2008.

26.        Defendant Durrani then began practice at Defendant CAST.

27.        Under information and belief, Defendant Durrani is an employee, agent, servant, member or owner of Defendant CAST.

28.        Under information and belief, Defendant Durrani was asked to leave Defendant Children's Hospital.

29.        Under information and belief, Defendant Children's Hospital had received previous complaints about Defendant Durrani.

30.        Plaintiff continued his treatment with Defendant Durrani at Defendant CAST.

31.        From the time of the August 8, 2008 surgery until completing his treatment with Defendant Durrani, Plaintiff continued to complain of pain at a greater degree than before the surgery.

32.        Plaintiff could no longer participate in sports, lawn care, or play with children.

33.        Defendant Durrani continued telling Plaintiff that he was healing well.

34.        Defendant Durrani continued to note in his record that Plaintiff was doing well with reduced pain.

35.        Plaintiff last treated with Defendant Durrani on or about September 22,

2009.

36.     Plaintiff had follow up treatment back at Defendant Children's Hospital with Dr. Agabegi on or about October 22, 2009.

37.     Plaintiff repeated his symptoms to Dr. Agabegi.

38.     Dr. Agabegi ordered a CT, stating the MRI's Defendant Durrani had been ordering would not show the fusion.

39.     The CT performed October 27, 2009 showed no fusion.

40.     This was the first Plaintiff heard the treatment of Defendant Durrani was improper.

41.     On or about December 30, 2009, Plaintiff had the screws surgically removed from L5-S1.

42.     Plaintiff immediately experienced pain relief.

43.     Plaintiff had no way of knowing during his treatment with Defendant Durrani that there was no pars fracture, nor that the screws may be causing the pain.

44.     Plaintiff has subsequently experienced instability and requires additional surgery because of the improper screw placements.

## COUNT I - NEGLIGENCE OF DOCTOR DURRANI

45.     Plaintiff incorporates by reference each and every allegation contained within the above paragraphs and further states:

46.     Defendant Dr. Abubakar Atiq Durrani owed his patient, Plaintiff Kenneth Wilson, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar

circumstances.

47.      Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, the negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery and installation of hardware, improper follow up care addressing a patient's concerns and lax documentation.

## COUNT II - NEGLIGENCE OF CAST

48.      Plaintiff incorporates by reference each and every allegation contained within the above paragraphs and further states:

49.      Defendant CAST owed its patient, Plaintiff Kenneth Wilson, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

50.      Defendant CAST breached that duty by failing to exercise the requisite degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, its negligent medical mismanagement, negligent diagnosis and mistreatment of Plaintiff.

51.      As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant, Plaintiff was caused to sustain severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of

ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT III - VICARIOUS LIABILITY OF CAST

52.     Plaintiff incorporates by reference each and every allegation contained within the above paragraphs and further states:

53.     At all times relevant, Defendant Dr. Durrani was a shareholder, director, officer, agent, and/or employee of CAST.

54.     Defendant Dr. Durrani was performing within the scope of his employment when dealing with the Plaintiff regarding the care of Plaintiff.

55.     Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

56.     Defendant CAST is vicariously liable for the negligent acts of Defendant Dr. Durrani alleged in this Complaint.

57.     As a direct and proximate result of Defendant CAST's actions, Plaintiff sustained harm.

## COUNT IV - NEGLIGENT SUPERVISION BY CINCINNATI CHILDREN'S HOSPITAL

58.     Plaintiff incorporates by reference each and every allegation contained within the above paragraphs and further state:

59.     Defendant Cincinnati Children's Hospital was responsible for the conduct of its residents, doctors, nurses and those doctors with privileges at the Hospital.

60.     Defendant Cincinnati Children's Hospital was in a unique position to

control the actions of the residents, doctors, nurses and those with privileges, and

owed a duty to Plaintiff to exercise said control.

61.     Defendant Cincinnati Children's Hospital breached this duty to Plaintiff by

not controlling the actions of the residents, doctors, nurses, and those with

privileges, during the medical treatment of Plaintiff Kenneth Wilson.

62.     As a direct and proximate result of the failure to properly supervise

medical treatment by the residents, doctors, nurses, and those with privileges by

Cincinnati Children's Hospital, Plaintiff has suffered severe and grievous injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant on all claims.  Plaintiffs

further request:

1.      Costs associated with the disbursement of this action;
2.      Interests;
3.      Punitive damages;
4.      Reasonable attorney's fees;
5.      All compensatory damages;
6.      Trial by jury; and
7.      All other relief this court deems fitting and proper.

Respectfully submitted,


Eric C. Deters (38050)
Eric C. Deters & Associates
5247 Madison Pike
Independence, KY 41051
(859) 363-1900
(859) 363-1444 (fax)

Eric@ericdeters.com

## JURY DEMAND

Plaintiffs respectfully request a trial by jury.

Eric C. Deters (38050)

## CERTIFICATION OF EXPERT REVIEW

Eric Deters certified he has had this matter reviewed by competent health care providers qualified to testify and they are willing to support the allegations made in the Complaint.

Eric C. Deters

Q:\Wilson, Kenny\Complaint.wpd

## Affidavit of Merit

I, Keith Wilkey, M.D., after bring duly sworn and cautioned state as follows:

1.     I have reviewed all relevant medical records reasonably available about Kenneth Wilson concerning the allegations of medical negligence.

2.     I am familiar with the applicable standard of care.

3.     Based upon my review of this record, my education, my training, and experience, it is my belief, to a reasonable degree of medical probability that the care provided by the Defendant Abubakar Atiq Durrani, M.D., Defendant Center for Advanced Technologies, Inc., and Defendant Cincinnati Children's Hospital Medical Center was negligent and this negligence caused injury to Kenneth Wilson.

4.     I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or to its instruction in an accredited school.

5.     My curriculum vitae is attached.

**FURTHER AFFIANT SAITH NAUGHT.**

Keith Wilkey, M.D.

STATE OF _Missouri_ )

COUNTY OF _St. Louis_ )

**SUBSCRIBER, SWORN TO AND ACKNOWLEDGED,** before me, a Notary Public, by Keith Wilkey, M.D. on the _21_ day of _December_, 2011.

Susan K. Vietmeier

Notary Public

My Comm. Exp _2-13-15_

SUSAN K. VIETMEIER
My Commission Expires
February 13, 2015
St. Louis County
Commission #11008831

### Keith D. Wilkey, M D
E-mail: kdwilkey@earthlink.net
C: 314-791-0883

Best method of communication is e-mail

Orthopedic Associates
Contact: Cynthia
Des Peres Square
1050 Old Des Peres Rd., Suite 100
St. Louis, MO 63131-1865
314-569-0612

Bone and Joint Institute
Contact: Sarah or Angie
Des Peres Medical Arts Pavilion
2325 Dougherty Ferry Road. Suite 202
St. Louis, MO 63122-3356
314-966-6480

Alpha Spine of Saint Louis
Orthopaedic and Spine Consultant
Contact: Cynthia
Des Peres Square
1050 Old Des Peres Rd., Suite 100
St. Louis, MO 63131-1865
314-569-0612
Dr. Wilkey direct: 314-791-0883

## EDUCATION

Bachelor of Science in Biochemistry,
June 1985,
The Ohio State University

Doctor of Medicine,
June 1989,
Wright State University School of Medicine

## POSTGRADUATE EDUCATION

Rotating Transitional Internship,
Brooke Army Medical Center,
San Antonio, TX,
July 1989 to July 1990

Orthopaedic Residency,
Brooke Army Medical Center,
San Antonio, TX,
July 1992 to July 1996

Spine Fellowship,
Letterman Spine Institute, University of Louisville,
Louisville, KY,
August 2004 to August 2005

## HONORS

AOA (third year), 1988,
Dean's Award 1986 and 1987,
China Medical Board Traveling Scholar, 1989,
Graduated first in class, 1989,
Army Achievement and Commendation Medals, multiple,
Saudi Arabia, Kuwait, and Southwest Asia Service Ribbons, 1991,
Third Place- Commander's Award for Outstanding House staff Research, 1996

## PUBLICATIONS AND PRESENTATIONS

**Mechanical Characteristics of Eight Femoral Intramedullary Nails**
Presented to the American Academy of Orthopaedic Surgeons (AAOS), February 1996,
and to the Society of Military Orthopaedic Surgeons, December 1995.
Published in the Journal of Orthopaedic Trauma, November, 1998.

**Patellar Fractures in an Elderly Population**
Presented to the North American Orthopaedic Guild, October 1994.

**Taking the Mystery Out of Orthopaedic Radiology and Advanced Orthopaedic Imaging**
Presented to the National Association of Orthopaedic Nurses (NAON), May 2001, 2002, 2003, 2004, 2005, and 2007

**Orthopaedic ER**
Presented to the National Association of Orthopaedic Nurses (NAON), May 2004 and 2005

**Oh...My Aching Back! The Discogenic Theory of Low Back Pain**
Presented to the National Association of Orthopaedic Nurses (NAON), May 2007
and to St. Louis Orthopaedic Residency Grand Rounds, October 2006

**Basic Fracture Identification and Radiographic Description**
Presented to 3rd year medical student surgery clerks University of Illinois at Champaign-Urbana 1999 through 2001 school years.

**WMUB Radio Sound Health**
Radio talk show guest orthopaedic and spine specialist for WMUB Sound Health, Monthly August 2002 through December 2004

## CERTIFICATIONS and POSITIONS

Board Certified - Orthopaedic Surgery 1998
Fellow - American Academy of Orthopaedic Surgeons (AAOS) 2000
Fellow - North American Spine Society (NASS) 2006
Associate Professor of Surgery, University of Illinois at Champaign-Urbana 1999 to 2001.
Voluntary Staff St. Louis University Dept. of Orthopaedic Surgery 2006 to present

## LICENSURE

Missouri, Kentucky, Illinois, Indiana, and Ohio Medical Licenses

## ORTHOPAEDIC EXPERIENCE

Chief of Outpatient Specialty Clinics / Orthopaedics
Ft. Drum MEDDAC
July 1996 to July 1998

Christie Clinic
Champaign IL
July 1998 to July 2001

Orthopaedics & Spine
Hamilton OH
August 2001 to August 2004

Alpha Spine LLC
St. Louis MO
September 2005 to present

## HOSPITAL PRIVILEGES (Current)

Des Peres Hospital
2345 Dougherty Ferry Rd.
St. Louis, MO 63122
314-966-9489

St. Joseph's Hospital, Kirkwood
525 Couch Ave.
St. Louis, MO 63122
314-966-1500

## PHYSICIAN REFERENCES

Maladen Djurasovic, MD (Fellowship Director)
Louisville Spine Institute
210 E. Gray St.
Louisville, KY 40202
502-584-7525

Steven Glassman, MD (Staff Surgeon)
Louisville Spine Institute
210 E. Gray St.
Louisville, KY 40202
502-584-7525

Steve Packard, MD (Chairman Dept. of Orthopaedics, Carle Clinic)
611 W. Park Ave
Urbana, Il 61801
217- 383-3260

William Price, MD (Former Partner)
101 W. University Ave
Champaign, Il 61820
217- 366-1237

MILITARY EXPERIENCE

Marine Reserve
June 1981 to May 1984

Brigade Surgeon, US Army
July 1990 to June 1992

Chief of Outpatient Specialty Clinics / Orthopaedics
Ft. Drum MEDDAC
July 1996 to July 1998

COMMUNITY

FBI Citizens Academy (Alumni)
November 2006

FBI InfraGuard Medical Consultant
November 2006 to present

Rotary International
October 2006 to present

Veterans of Foreign Wars
November 2005 to present

Member Universialist Unitarian Church
June 2002 to present

AVOCATIONS

Private Pilot License
September 2006 to present

Basic, Advanced, and NITROX certified SCUBA diver
August 2000 to present

Arts, Humanities, and Sciences